OPINION OF THE COURT
William D. Friedmann, J.
In the context of this action for specific performance, the Scholastic Aptitude Test (SAT), widely used to evaluate the potential of candidates for college admission, is considered. This extremely important examination is the key to admission into an educational institution of choice, to the awarding of scholarship grants and as the basis for other financial assistance incentives. It is evident that such a test’s development, administration and evaluation must be conducted fairly and under circumstances evidencing a relationship of good-faith dealings.
Brian Dalton (Brian), as a junior at Holy Cross High School in Queens, took the SAT which was developed, administered and evaluated by Educational Testing Service (ETS) in May 1991 and received a combined verbal and math score of 620. Disappointed with the results, which did not qualify him for a St. John’s University swimming scholarship, Brian was advised by his guidance counselor to enroll in a SAT review or coaching course and to take the examination again in different surroundings. As a senior, Brian took the SAT again six months later, on November 2, 1991, at John Bowne High School. He attained a combined verbal and math score of 1030 or an increase of 410 points.
As the result of a routine computer check, Brian’s scores were reviewed by the Educational Testing Service’s Office of Test Security. ETS informed Brian that because of the large increase in scores and because of handwriting differences allegedly found by an ETS’ employee in the Test Security Office, "the evidence suggests that someone else may have completed your answer sheet and that the questioned scores may be invalid.” Brian was presented with various options at this juncture and chose to submit additional information to ETS relevant to a review of the questioned scores. Having been unsuccessful in persuading ETS to alter its determination, the Dalton family instituted this action to compel the release of the scores obtained by Brian at the November 2, 1991 SAT examination.
*216 HISTORY OF PROCEEDINGS
Peter Dalton (plaintiff), as parent and natural guardian of Brian, originally commenced a special proceeding to compel ETS to release the SAT results of Brian to the colleges and universities of his selection for the examination administered on November 2, 1991. ETS cross-moved to convert the special proceedings into an action at law and upon conversion, for summary judgment dismissing the complaint. By order dated March 9, 1992 ETS’ motion was granted solely to the extent of converting the special proceeding into an action of law. The petition was deemed a complaint alleging a cause of action for specific performance of a contract and summary judgment was denied on the ground of the existence of a triable issue of fact with respect to defendant’s good faith in the discharge of its contractual obligations. ETS’ motion for a stay pending determination of its appeal of the order denying summary judgment was denied by the Appellate Division. (Matter of Dalton, NYLJ, Apr. 15, 1992, at 25, col 6.)
Plaintiff was subsequently granted leave to amend the complaint to allege additional causes of action for money damages, to be tried separately from the original cause of action. Upon the completion of disclosure, an expedited non-jury trial of the first cause of action was afforded the parties. The trial proceeded over a period of 12 days. The parties presented 25 witnesses, 16 for the plaintiff and 9 for ETS, whose testimony occupied more than 2,000 pages of transcript.
CONTENTIONS IN SUMMARY
Plaintiff argues that ETS was contractually obligated to conduct a fair and thorough investigation when questioning the validity of Brian’s scores on the November 2, 1991 SAT examination. He contends that ETS breached its contract by refusing to give proper consideration to the substantial relevant evidence of Brian’s presence at the November 2, 1991 SAT examination, by failing to conduct a proper investigation and by relying on inadequate evidence to support its decision to continue questioning the validity of Brian’s score.
ETS contends that it has an unqualified right to question the validity of SAT scores that may have been unfairly obtained. It argues that the court’s review must be directed, not to a factual inquiry into whether an impostor sat for Brian Dalton at the November 2, 1991 SAT examination or whether the court would have reached the same conclusions *217 as ETS, but rather, solely whether ETS followed the procedures set forth in the SAT Registration Bulletin. ETS contends that its investigation was conducted strictly in accordance with its internal policies and was, therefore, in compliance with its obligations.
RELEVANT FINDINGS IN TRIAL RECORD
ETS is a private, not-for-profit corporation which develops and administers the SAT by arrangement with the College Entrance Examination Board. Students who seek admission to institutions that are members of the College Board must take the SAT as part of the admission process. In the 1990-1991 academic year approximately 2,400,000 students registered to take the SAT and ETS sent scores to over 6,000 colleges. When students like Brian register to take the SAT they "agree to the conditions in the New York State Edition of the Registration Bulletin concerning the administration of the tests and the reporting of scores”. With respect to the cancellation of scores, the SAT Bulletin provides the following:
"The College Board is obligated to report scores that accurately reflect your performance. For this reason, ETS maintains, on behalf of the College Board, test administration and test security standards designed to assure that all test takers are given the same opportunity to demonstrate their abilities and to prevent any student from gaining an unfair advantage over others because of testing irregularities or misconduct. ETS routinely reviews irregularities and test scores believed to be earned under unusual or questionable circumstances.
"ETS reserves the right to cancel any test score if the student engages in misconduct, if there is an administration irregularity, or if ETS believes there is reason to question the score’s validity. Before test scores are canceled for misconduct, the student is notified and given an opportunity to provi de additional information. When test scores are canceled because of administrative irregularities, such as improper timing or defective materials, the student is given an opportunity to take the test again as soon as possible at the College Board’s expense.
"When the validity of a test score is questioned because it may have been obtained unfairly, ETS notifies the test taker of the reasons for questioning the score and gives him or her an opportunity to provide additional information, to confirm the questioned score by taking the test again, or to authorize ETS to cancel the score and receive a refund of all test fees.
*218 "In addition, the test taker can request third-party review of the matter by asking any institution to review the information and make its own decision about accepting a score that may be invalid or by asking that a member of the American Arbitration Association arbitrate ETS’ action in accordance with ETS procedures established for this purpose. Special exceptions and additional details of the procedures for questioning scores and for third-party reviews are available on request.”
The internal procedures employed by ETS in validating SAT scores are centered around the "Test Security Office” (TSO) and the inhouse "Board of Review.” Scores are routinely checked for what ETS defines as "large score differences.” ETS considers an increase of 250 points in either the verbal or math sections of the SAT or an over-all increase of 350 points to constitute a large score difference or "LSD.” Where an LSD is found, it is the function of the TSO to open an "investigative brief’ or "investigative file” consisting of the questioned test answer sheet, prior answer sheet and the test taker’s respective registration forms. A "Test Security Specialist”, an employee in the Test Security Office, initially reviews the documents for inconsistent handwritings and initiates a computer check comparing the questioned answer sheet with other answer sheets from the same examination room and test center for instances of "unusual agreement”, or suspected cheating. As a matter of ETS policy, if no unusual agreement or disparate handwriting is found, the Security Office clears the scores and the review proceeds no further. In terms of actual cases, however, of the approximately 416 cases involving large score differences arising in the academic year of November 1990 through June 1991, approximately 400 of these scores are ultimately canceled by ETS.
In Brian’s case the "unusual agreement” check produced negative results but the Test Security Specialist involved, while not formally trained in handwriting analysis, formed a "doubtful opinion” about the handwriting on Brian’s second SAT answer sheet. As a result, the documents were submitted to a handwriting examiner on permanent retainer by ETS who concluded that the May and November exams were not written by the same person. Findings of disparate handwriting are made by regularly retained ETS handwriting experts in excess of 90% of the cases sent to them for opinions.
According to ETS procedures, the Test Security Office submitted Brian’s answer sheets, registration forms and the *219 handwriting opinions of the Test Security Officer and handwriting examiner to the ETS Board of Review. The Board of Review is an inhouse rotating panel of three senior ETS staff members recruited from various departments of ETS who meet twice a week for approximately three hours, handling 20 to 30 cases per session, to review the materials gathered by the Test Security Office. None of the members of the Board of Review receive training in handwriting analysis. The three board members make individual determinations, without deliberation or even discussion or standards of consideration, as to whether there is substantial evidence to support the cancellation of scores. Although ETS policy permits that the affirmative vote of any one panel member will release questioned scores, that policy is not often implemented by members of the Board of Review who rarely, if ever, disagree with the conclusions reached by an ETS document examiner.
In Brian’s case the Board of Review made a preliminary decision that based on the material submitted by the Test Security Office, there existed substantial evidence to support cancelling Brian’s November 2, 1991 SAT scores. In a letter from a "Test Security Specialist” Brian was informed that "there is substantial evidence to support cancelling your November 2, 1991 Scholastic Aptitude Test scores. This preliminary decision was made by an independent panel of ETS professional staff based upon a careful review of information related to these scores including a comparison of these scores with others you earned on this test and comparisons of the handwriting on your answer sheet with handwriting on other documents.” The ETS letter went on to state that the "review produced unusual results. For example, the handwriting on your answer sheet differs from the handwriting on other documents that bear your name. In addition, there is a substantial difference between these scores and others you have earned on this test. The evidence suggests that someone else may have completed your answer sheet and that the questioned scores may be invalid.”
ETS advised Brian that a final decision had not been made and that he could avail himself of the options as provided for in the SAT Registration Bulletin. Brian was informed that he could submit additional information relevant to a review of the questioned scores, take the test again to confirm the validity of his scores or cancel the scores. Brian was also informed that he could opt to have ETS report the scores to chosen colleges or universities along with ETS’ conclusion of *220 "substantial evidence supporting cancellation” and have the institution make an independent evaluation, or Brian could choose to arbitrate ETS’ determination before a member of the American Arbitration Association. If Brian failed to exercise one of the options within a prescribed time period, he was told the scores would be cancelled.
Brian chose the option of submitting additional information to ETS in an effort to answer the questions posed by ETS communications. He advised ETS’ Security Office that no one other than himself took the SAT on November 2, 1991, that at no time did he exchange papers with anyone nor did he sign the answer sheet of another person. He informed ETS that he had been ill with mononucleosis during the May 1991 examination and submitted evidence of his academic abilities; that he had maintained an average of 85 and received second honors while at Holy Cross. He also informed ETS that he had completed a test preparation or coaching course and he submitted to ETS the diagnostic tests administered by the Princeton Review, a "coaching course” in verbal, math and SAT test-taking skills which he attended in the period between the two examinations. Those diagnostic tests indicated test results consistent with his subsequent performance on the November 2, 1991 SAT.
To support his denial that an imposter had taken the November 2, 1991 SAT, Brian furnished ETS with the report of a document examiner retained by the Dalton family who, disagreeing with the ETS examiner, found that Brian’s handwriting matched both the May and November SAT examination sheets. Submitted to the Test Security Office was the statement of the ETS paid proctor who supervised the administration of the SAT in the classroom assigned to Brian at John Bowne High School on November 2, 1991. In this statement the proctor informed ETS that she specifically recognized Brian Dalton at a subsequent meeting, arranged by the ETS SAT test administrator at John Bowne High School, as being present in the classroom on November 2, 1991. She recalled his photo identification card from Holy Cross High School, which was unlike the more familiar identifications of John Bowne students, and remembered having reprimanded him for talking during a break in the examination. She also recalled the Dalton name, originally linking it with a private school in Manhattan of the same name. The proctor further informed ETS in her statement that Brian had recognized her at this subsequent meeting and was able to detail her unique *221 classroom instructions and procedures, including her requirement that students sign the roster sheet in her presence beside their printed names.
The proctor’s statement was accompanied by the statements of two students who also identified Brian as being the person in the classroom on the day of the exam. One student, previously unacquainted with Brian, specifically stated that Brian had stood out in the classroom that day because he was fair-complexioned and blue-eyed and exhibited "an attitude”, while the majority of the other test takers were Asian, African-American or Hispanic. The statement by the ETS paid SAT test administrator at John Bowne High School test center confirmed that Brian had correctly identified the proctor from other individuals present at the subsequent meeting. Lastly, Brian offered to submit to a lie-detector test, at his own expense, and to have his fingerprints taken and compared to those latent fingerprints which ought to be found on the November 2, 1991 answer sheet and test booklet.
Despite receipt of these statements which directly contradicted the factual premise of the report of ETS’ handwriting examiner and despite the absence of an irregularity report by the proctor, ETS’ Test Security Office and Board of Review made no effort to contact or question either their proctor or their test administrator who were ETS agents or employees, or the preferred students. ETS further refused to attempt to resolve this contradictory information by accepting Brian’s offer that he be fingerprinted and given a lie-detector test. Instead, a second handwriting examiner, also on regular ETS retainer, was requested to review the documents. He agreed with the conclusions contained in the first report and the Board of Review continued to find that the questions of disparate handwriting had not been resolved and continued to question the validity of the November 2, 1991 scores. To the extent that any attempt was made to resolve the conflict, ETS, at a very late date, had Brian’s handwriting compared to the other 22 answer sheets of students who took the SAT in his classroom to determine if his handwriting appeared on any of the other test papers. The document examiner who examined same was unable to conclude that Brian’s handwriting appeared on any other test booklet.
LEGAL CONCLUSIONS
The relationship between ETS and Brian (a minor) arises *222 out of a contract entered into when Brian registered to take the SAT and agreed to abide by the terms stated in the SAT Registration Bulletin for the administration of the examination and the reporting of scores by ETS. (See, Matter of Yaeger v Educational Testing Serv., 158 AD2d 602.) The terms of this contract between ETS and Brian were not achieved through arm’s length negotiations and represent, without dispute from the parties, a contract of adhesion. As was aptly described by Mr. Justice Fraiman in Matter of K. D. v Educational Testing Serv. (87 Misc 2d 657, 662-663): "A contract of adhesion is one entered into between parties with unequal bargaining power. They are typically standard contracts which are offered by the party with strong bargaining power to the weaker party on a take it or leave it basis. The instant agreement would appear to fit this description. Almost every accredited [college] in the United States requires a candidate for admission to take the [SAT]. Thus, when plaintiff decided to attend [college] he had no alternative but to accept the standard conditions fixed by defendant for all test takers. Plaintiff could neither contract with a party other than defendant to take [the SAT], since no such entity exists, nor indicate to defendant that the terms contained in the bulletin were riot acceptable to him. In the latter case it is clear that if he had done so he would not have been permitted to take the examination.”
Standardized contracts are not, however, unenforceable merely because of the inequality of bargaining power of the parties, without additional proof of unconscionability or violation of public policy. (Finkle & Ross v A.G. Becker Paribas, Inc., 622 F Supp 1505.) No challenge is made to ETS’ contractual right to cancel any test score "if ETS believes there is reason to question the score’s validity” (emphasis added). In this action Brian Dalton does not seek to avoid the terms of the contract, merely to enforce them.
It is an overriding principle of the law of contracts that inherent in every contract are "certain implied-by-law covenants, such as the promise to act with good faith in the course of performance” (Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 68). To act in good faith requires "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract” (Kirke La Shelle Co. v Armstrong Co., 263 NY 79, 87). Moreover, that a specific promise has not been expressly stated does not necessarily mean that it was not intended or does not exist. "[T]he undertaking of each promisor in a *223 contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included.” (11 Williston, Contracts § 1295, at 37 [3d ed].) The Appellate Division of the Second Department has described the standard as "the thorough efforts undertaken by ETS to ascertain the validity of the scores” (Matter of Yaeger v Educational Testing Serv., supra, at 604).
Since the issues of this case arise out of a contract, ETS’ reliance on the business judgment rule (see, Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530; Kirsch v Holiday Summer Homes, 143 AD2d 811) or on the limited judicial review of the exercise of administrative discretion by universities (see, Matter of Olsson v Board of Higher Educ., 49 NY2d 408; Tedeschi v Wagner Coll., 49 NY2d 652) is misplaced. In addition, while the court has been guided by the legal principles established in prior New York cases in which ETS defended its contractual performance, each case involving the issue of the good-faith performance of a contract must necessarily be decided on its own facts. In Matter of Yaeger v Educational Testing Serv. (supra), the test taker declined to exercise any of the options provided for in the contract. In De Pina v Educational Testing Serv. (31 AD2d 744), a case which did not arise out of a large score difference but an "unusual agreement” in test answers, the sole option provided by the contract was a retest and no evidence other than a denial of cheating was submitted by the test taker. In Matter of K. D. v Educational Testing Serv. (supra), ETS found similarities between plaintiff’s answers and the answers of another test taker seated adjacent to plaintiff, but other than plaintiff’s own statement that he had not cheated, no additional information was submitted to ETS.
The requirement of the good-faith performance of a contract is not merely abstract legal theory. The principle is of particular importance to the parties herein, where the essence of the contract between ETS and Brian Dalton grants to ETS the exclusive right to determine whether Brian Dalton’s SAT scores will be released to the colleges of his choice. Implicit in such a contractual arrangement is ETS’ obligation to insure that the options offered students whose scores are questioned have substantive meaning. It must be noted that the sole issue before this court for determination is whether or not ETS performed its contract with Brian in good faith. Whether or not Brian took the SAT on November 2, 1991 does not bear on *224 this ultimate issue and will, therefore, not be determined by this court.[1]
In face of two mutually exclusive factual premises, that an imposter took the SAT or that Brian took the SAT, ETS arbitrarily chose to rely solely on handwriting analysis.[2] Notwithstanding nomenclature of "Test Security Office”, "Test Security Specialist”, "investigative brief’ or "investigative file”, no investigation was conducted by ETS. The Security Specialist is described by ETS executives as a clerical employee, not unlike a secretary, whose function, apart from handwriting review, is merely to assemble documents for presentation to the ETS nonindependent Board of Review.[3]
The difficulty presented by the Board of Review’s reliance on handwriting analysis to the exclusion of other available avenues of investigation is that ETS’ own regularly retained handwriting examiners concede that two qualified document examiners can come to different conclusions involving the same documents. Even as between ETS’ two experts a difference of views was expressed during trial. While one found the signatures appearing on the November 2, 1991 answer sheet to have been "good simulations” of Brian’s handwriting, the other expert was of the opinion that the disputed signatures "were terrible simulations.” The effect of the failure to investigate alternative explanations is further highlighted by the testimony of the first ETS handwriting examiner who confirmed that the same person signed both the test room attendance roster and the November 2, 1991 answer sheet. He conceded that if the proctor had testified that she had observed Brian Dalton sign the attendance roster, then one of them was wrong.
*225 In the view of ETS the only issue before the Board of Review was the question of disparate handwriting and the sole purpose in having Brian submit additional information was to explain the alleged disparate handwriting. In formulating the issue in this manner ETS created a burden that was impossible to meet since the conclusion was predetermined. Therefore, whether or not Brian could establish that he was present at the examination was deemed irrelevant since this information could not resolve the discrepancy in handwriting found by the ETS examiners. The only means by which Brian could successfully controvert the opinion of the ETS handwriting analysts was, according to ETS, to take a retest. The contract between the parties, however, does not provide that in cases of large score differences the decision of the ETS handwriting examiner will be final, nor does it provide that in cases of large score differences the student must take a retest to validate an SAT score, nor does it provide that information submitted to the ETS Board of Review by the student will be received but not evaluated.
ETS adhered to its stated internal policies and procedures by offering to Brian the options provided for in their contract, but by failing to make even rudimentary efforts to evaluate or investigate the information furnished by Brian, information that was clearly relevant to a rational decision-making process, ETS reduced its contractual undertaking to an exercise in form over substance. ETS, therefore, breached its adhesion contract with Brian by failing to act in good faith in the course of determining whether there was reason to question the validity of Brian’s SAT score. Under these circumstances, Brian is entitled to the benefit of his contract with ETS and since the subject matter of that contract is undeniably unique, specific performance is the proper remedy. The court, therefore, directs ETS to release, without comment or qualification, the November 2, 1991 SAT scores of Brian Dalton.

. While also not dispositive of the issues raised herein, the parties have vigorously contested the benefits of "coaching courses”, like the Princeton Review, in enabling students to dramatically raise their SAT scores. (See, Stockwell, Schaeffer & Lowenstein, The SAT Coaching Cover-Up; How Test Preparation Programs Can Raise Scores by 100 Points or More and Why the College Board and ETS Deny the Evidence, National Center for Fair & Open Testing [Dec. 1991].)

. As can be seen from the conflicting testimony of three well qualified document examiners, handwriting analysis is far from an exact science. (Risinger, Denbeaux & Sax, Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification "Expertise”, 137 U Pa L Rev 731 [1989].)

. The apparent confusion as to the role of the Test Security Office as well as the lack of standards or an independent, deliberative review by the Board of Review warrants an evaluation by ETS of its internal structure.