■ PETER DALTON, as Parent and Natural Guardian of BRIAN M. DALTON, an Infant, Respondent, v EDUCATIONAL TESTING SERVICE, Appellant. [614 NYS2d 742] —In a proceeding pursuant to CPLR article 78 to prohibit the Educational Testing Service from cancelling Brian M. Dalton's test scores on the November 2, 1991, Scholastic Aptitude Test, which was converted into an action at law, Educational Testing Service appeals, as limited by its brief, from so much of a judgment of the Supreme Court, Queens County (Friedmann, J.), dated August 17, 1992, as, after a nonjury trial, directed it to release Brian M. Dalton's test scores on the November 2, 1991, Scholastic Aptitude Test without comment or qualification.

Ordered that the judgment is affirmed insofar as appealed from, with costs.

Brian M. Dalton was a high school senior who took the Scholastic Aptitude Test as administered by the appellant, Educational Testing Service (hereinafter ETS). His May 1991 test resulted in a combined verbal and math score of 620. After taking a review course, Dalton took the examination again in November 1991 and scored a combined score of 1030. As is their accepted practice in reviewing large score differentials between two examinations taken by the same person, ETS scrutinized Dalton's two answer sheets to check for disparate handwriting, which would suggest that he did not take both examinations, or unusual agreement with the answers of another exam-taker, which would suggest copying.

While ETS claims to have conducted a conscientious investigation regarding Dalton's explanations for the increased score, the record is utterly devoid of any showing that the ETS board considered anything other than the reports prepared by its two document examiners which concluded that the handwriting on the May 1991 answer sheet differed from the handwriting on the November 1991 answer sheet.

No effort was made by ETS to interview two of its employees, test administrator Robert Schnabel and proctor Bonnie Hirschhorn, who submitted letters and affidavits to the effect that Dalton was present at the November test. Indeed, Hirschhorn affirmed that she saw Dalton at the November test and that he signed the roster in her presence after displaying his school photo identification card. The ETS board further took no note of the fact that Dalton suffered from mononucleosis (for which documentation was provided) at the time of the May test nor of the fact that he prepared for the November test by taking an intensive six-week review course prior to the test, and that numerous employees of the review course swore that Dalton's scores had dramatically increased on practice tests they administered to him, and that the errors and patterns on the four practice tests were consistent with the errors made in the actual November 1991 test. ETS gave no consideration to Brian's scholastic record of "second honors" at his high school, with an overall average of 85.

Additionally, ETS gave no consideration to the affidavit of a student who swore that Dalton was previously unknown to him but that he remembered seeing him in the classroom during the November test since Dalton was fair-skinned and blue-eyed, which caused him to stand out among the Asian and Hispanic students. ETS similarly did not credit the affidavit of a friend of Dalton's who averred that Dalton drove him to the school, where they took the test together. Finally, ETS summarily dismissed the affidavit of Dalton's document examiner, who averred that the same individual executed the May and November tests and that that individual was Brian M. Dalton.

Implicit in every contract is an implied covenant of good faith and fair dealing *(see, Goodstein Constr. Corp. v City of New York,* 80 NY2d 366; *Components Direct v European Am. Bank & Trust Co.,* 175 AD2d 227; *Matter of Yaeger v Educational Testing Serv.,* 158 AD2d 602). In this case, unlike the situation presented in *Matter of Yaeger v Educational Testing Serv. (supra),* Dalton complied with all of ETS's requests for additional documentation and, over the course of time, proffered numerous affidavits, writing samples, and an expert report to establish that it was he who took the test. The practice of ignoring Dalton's evidence without even initiating a preliminary investigation clearly demonstrate a lack of good faith by ETS.

Despite Dalton having signed ETS's bulletin agreeing to be bound by the conditions set by it, one of those conditions being

that ETS reserved the right to cancel any test scores it reasonably deemed questionable, we find that ETS breached the implicit duty of good faith in failing to consider Dalton's evidence by steadfastly adhering to its refusal to release the test scores. Thompson, J. P., Balletta, O'Brien and Florio, JJ., concur.