**AVIALL, INC., Plaintiff,**

v.

**RYDER SYSTEM, INC., Defendant.**

No. 95 Civ. 0710 (MBM).

United States District Court,
S.D. New York.

Feb. 7, 1996.

828

Andrew W. Hayes, Jones, Day, Reavis & Pogue, New York City, Terence M. Murphy, Chrysta L. Osborn, Jones, Day, Reavis & Pogue, Dallas, TX, for Plaintiff.

Stuart Baskin, R. Paul Wickes, Kathryn Tabner, Amanda J. Gallagher, Shearman & Sterling, New York City, for Defendant.

MUKASEY, District Judge.

Plaintiff Aviall, Inc., and its former corporate parent, Ryder System, Inc., dispute the allocation of pension-related balance sheet items set forth in the Distribution Agreement governing Ryder's December 1993 spin-off of Aviall. In accordance with that agreement, Aviall initially submitted the dispute to KPMG Peat Marwick ("KPMG") for arbitration, but now seeks to disqualify KPMG and asks the court to reform the contract and appoint a neutral arbitrator. Ryder moved to dismiss the complaint for failure to state a claim for relief, or in the alternative to stay the litigation until the conclusion of the arbitration. While Ryder's motion was pending, Aviall moved for summary judgment. Ryder then cross-moved for summary judgment. For the reasons that follow, Aviall's motion for summary judgment is denied, and Ryder's cross-motion for summary judgment is granted. The other motions are moot.

I.

■ The following facts are drawn from the complaint, affidavits, deposition testimony and documentary exhibits submitted by both parties. On cross-motions for summary judgment, the standard is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other. When evaluating each motion, the court must consider the facts in the light most favorable to the non-moving party. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). Simply because the parties have cross-moved, and therefore have implicitly agreed that no material issues of fact exist, does not mean that the court must join in that agreement and grant judgment as a matter of the law for one side or the other. *Id.* The court may conclude that material issues of fact do exist and deny both motions.

Prior to December 1993, Ryder operated a variety of logistics and transportation businesses, including Aviall, a subsidiary engaged primarily in aviation-related services. (Compl. ¶ 6) In 1993, as part of a reorganization, Ryder decided to leave the aviation field and to distribute new shares in Aviall to Ryder's shareholders. (*Id.*) As a result of the spin-off, shareholders who previously had an interest in Aviall only by virtue of their ownership of Ryder stock, held stock in both Ryder and Aviall.

To memorialize this transaction, Ryder drafted a Distribution and Indemnity Agreement (the "Agreement"), dated November 23, 1995. (*Id.* at ¶ 1) The Agreement outlined several aspects of the new relationship between the companies, including the distribution of stock, tax-sharing, employee benefits, indemnification, access to corporate information, and pension-accounting treatment. (*Id.* at Ex. A) The Agreement also required Ryder to create a Distribution Statement recording the intracompany payments generated by the spin-off, and deliver it to Aviall at least three days before the effective date of the spin-off. (*Id.* at Ex. A § 3.03(a)) Section 3.03(c) of the Agreement governs any disputes between the parties relating to that Distribution Statement and states:

> If there are any items related to the Distribution Statement which are in dispute, then such items shall be submitted to KPMG Peat Marwick ("Peat Marwick") for resolution.

At the time of the spin-off and for some time thereafter, KPMG was the accountant for both Ryder and Aviall. As such, KPMG was familiar with the financial statements of both companies before their separation, and with the terms of the separation itself.

Section 3.03(c) was not the only dispute resolution provision, and KPMG was not chosen as arbitrator for all disputes. For example, § 3.11(n) provides that

> In the event of any dispute between Ryder and Aviall regarding the amount of the Proceeds Payment and if, at the time of such dispute, Peat Marwick are the independent auditors for both Ryder and Aviall, Peat Marwick shall review the calculations of the Proceeds Payment submitted by each of Ryder and Aviall and shall act as arbitrator of any such dispute. If, at the time of such dispute, Peat Marwick are not the independent auditors for both Ryder and Aviall, then the parties shall select another nationally recognized certified public accounting firm, which does not serve as independent auditors for either Ryder or Aviall, to resolve any such dispute.

Furthermore, § 5.04 of the Tax Sharing Agreement, executed in connection with and required by § 3.04 of the Distribution Agreement states that

> any disputes between the parties with respect to this Agreement shall be resolved by a 'Big Six' public accounting firm or a law firm satisfactory to Ryder and Aviall.

Finally, § 6.04 of the Agreement provides that it "shall be governed by and construed in accordance with the laws of the State of New York."

One of the problems that arose during the structuring of the spin-off was how to divide the pension plans for Aviall and Ryder employees. Ryder originally planned to transfer to Aviall all of the pension assets and liabilities for employees going to Aviall (Huston Dep. pp. 61–62; Teneglia Dep. pp. 107–08), but the Pension Benefit Guaranty Corporation ("PBGC") objected to this plan out of concern that the obligations would not be met if they were transferred. The PBGC wanted Ryder to guarantee any payments for employees transferred to Aviall. (Huston Dep. pp. 62–66; Mojena Dep. Ex. 2) Ultimately, Ryder and the PBGC agreed that Ryder would retain the investments and pay the pensions of Aviall employees until the spin-off, and that Aviall would be responsible for all benefits earned by Aviall employees thereafter. (Murphy Dep. pp. 84–85; Mojena Dep. Ex. 2) As a result, Ryder had a large deferred cost associated with the Aviall employees prior to the spin-off, which took the form of a prepaid pension expense asset allocated to the Aviall balance sheet.

During its negotiations with the PBGC, Ryder sought assistance on this matter from its accountant KPMG. In response to Ryder's inquiry, on November 3, 1993, several weeks before execution of the Agreement and the spin-off, KPMG issued a Record of Inquiry ("ROI") on the pension-accounting treatment, in which John R. Deming, a partner in KPMG's Department of Professional Practice, recorded that Ryder had inquired about the division of the pension plans, and approved Ryder's proposal for the pension accounting. (Deming Dep. pp. 4, 8 & Ex. 1) In the ROI, Deming remarked that Ryder's suggestion "appears to be ... reasonable," but that "it is possible that others may insist on a more mechanical approach which could result in a larger proportion of the unrecognized net loss being retained by the client." (*Id.* at Ex. 1) Approximately two weeks later, on November 16, 1993, again prior to the Agreement and the spin-off, KPMG senior manager Hector Mojena wrote a memo in which he too approved Ryder's proposal. (Mojena Dep. Ex. 2) Finally, KPMG signed off on its audit of Ryder's and Aviall's 1993 year-end financial statements, which reflected the above-described pension-accounting treatment. (Huston Dep. pp. 32–33) Hamlin and Mojena of the Miami office performed Ryder's audit, and Bruce Piller of the KPMG's Dallas office handled the Aviall engagement. (Piller Dep. pp. 10–11) Some time after these audits, Aviall switched accountants.

After execution of the Agreement, Aviall sought to reallocate the pension-related balance sheet items. It did so first through informal negotiations with Ryder. When these discussions broke down in November

1994, Aviall requested formal dispute resolution by KPMG pursuant to § 3.03(c) of the Agreement. (Def.Mem. to Dismiss Ex. C) Aviall knew then that KPMG had helped draft the Distribution Agreement and that KPMG was still Ryder's accountant.

After learning of the dispute, Richard Hamlin, the KPMG partner in charge of the Ryder account, asked Andrew Capelli, a partner in the Department of Professional Practice who works in the New York office, to serve as arbitrator, and Capelli agreed. (Hamlin Dep. pp. 71–73; Capelli Dep. pp. 51–52) Capelli works closely and meets socially with John Deming, the partner who issued the ROI approving Ryder's proposed pension allocation prior to the Distribution Agreement and spin-off. (Capelli Dep. pp. 6, 26) Shortly after his appointment, Capelli, upon Hamlin's request, gave Hamlin the names of several employee benefits experts. (Hamlin Dep. pp. 85–87)

Aviall then changed its mind about KPMG and commenced this action to disqualify KPMG and substitute a neutral arbitrator. Aviall contends that KPMG, regardless of who it designates to hear the case, is biased towards Ryder, and that Andrew Capelli has prejudged the case. Ryder argues that these issues are not ripe for decision prior to the arbitration, and that even if they were, KPMG and Capelli are able to arbitrate the dispute fairly.

## II.

Subject-matter jurisdiction arises from diversity of citizenship. 28 U.S.C. § 1332(a) (1988). Plaintiff is a Delaware corporation with its principal place of business in Texas, and defendant is a Florida corporation with its principal place of business in Florida. (Compl. ¶¶ 2–4) The pension-related accounts at issue in the underlying dispute exceed $50,000 exclusive of interest and costs (*id.* at ¶ 4), and thereby satisfy the amount in controversy requirement of the statute. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 346, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977); *A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 87 (2d Cir. 1991).

This action is governed in part by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.,* and in part by New York contract law. Section 2 of the FAA states that

A written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (1994). Section 1 of the FAA defines "commerce" to mean "commerce among the several States," 9 U.S.C. § 1 (1994), known also as "interstate commerce."

For cases that fall within its reach, the FAA governs all aspects of arbitration procedure and pre-empts inconsistent state law, *Southland Corp. v. Keating,* 465 U.S. 1, 16, 104 S.Ct. 852, 861, 79 L.Ed.2d 1 (1984), *Barbier v. Shearson Lehman Hutton, Inc.,* 948 F.2d 117, 120 (2d Cir.1991), even when subject-matter jurisdiction is based on diversity of citizenship and when the parties, as here, have selected a particular state's law by contract. *Merrill Lynch, Pierce, Fenner & Smith v. Shaddock,* 822 F.Supp. 125, 135 (S.D.N.Y.1993). The court applies state law principles of contract and agency to determine whether a particular dispute is arbitrable, *First Options of Chicago, Inc. v. Kaplan,* —— U.S. ——, ——, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995), or whether the agreement to arbitrate is revocable. *Southland,* 465 U.S. at 11, 16 n. 11, 104 S.Ct. at 858, 861 n. 11; *McAllister Bros. Inc. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980); *Vimar Seguros Y. Reaseguros, S.A. v. M/V Sky Reefer,* 29 F.3d 727, 731 (1st Cir.1994), *aff'd,* —— U.S. ——, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995).

This case undeniably falls within the interstate commerce prong of FAA § 2 and the parties do not dispute its applicability. Accordingly, the FAA and any consistent New York law govern all procedural issues raised by the parties, including the court's power to remove a designated arbitrator prior to the arbitration, and New York law determines whether the contract is revocable.

## III.

A motion for summary judgment may be granted when the evidence before the court shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). While the dispute between Aviall and Ryder certainly presents a host of disputed fact issues, relating primarily to the proper allocation of the pension assets and responsibilities, none of those are material to the question of whether this court, before the arbitration, should substitute an arbitrator for the one contractually agreed upon by the parties.

First, Aviall argues that the arbitration clause may not be enforced because the Agreement is a contract of adhesion. (Pl. Mem. in Opp'n to Mot. to Dismiss p. 16) Historically, an allegation that the arbitration clause alone had been fraudulently procured, or was otherwise unenforceable, was decided by the court, while allegations that the entire contract was unenforceable could be decided only by the arbitrator, absent a separate attack on the arbitration clause. *Prima Paint Corp. v. Flood & Conklin Mfg. Corp.*, 388 U.S. 395, 402–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967). This dichotomy was based on the perceived separability of the arbitration clause from the contract as a whole. *Id.*

■ Last year, however, the Supreme Court announced that whether the parties agreed to arbitrate an issue is for the courts, not the arbitrator, to resolve, unless the contract itself specifies otherwise. *First Options,* —— U.S. at ———–——, 115 S.Ct. at 1923–24. That holding suggests that the related and antecedent issue of whether an agreement to arbitrate is a contract of adhesion, fraudulently induced, or otherwise revocable, is an issue for the court as well, because essential to the *First Options* inquiry is the assumption that an agreement to arbitrate was made voluntarily. *See Maye v. Smith Barney, Inc.*, 897 F.Supp. 100, 106 n. 3 (S.D.N.Y.1995) (noting that the *Prima Paint* dichotomy might not survive *First Options* ). Even if the *Prima Paint* dichotomy still exists, Aviall's claim should be read to address both the contract as a whole and the arbitration clause individually. Accordingly, I will evaluate Aviall's claim of adhesion.

■ New York contract law presumes that a written agreement is valid and that it accurately reflects the intention of the parties, and imposes a heavy burden on the party seeking to disprove those presumptions. *Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 574, 498 N.Y.S.2d 344, 347, 489 N.E.2d 231, 234 (1986); *Investors Ins. Co. of America v. Dorinco Reinsurance Co.*, 917 F.2d 100, 105 (2d Cir.1990). A court will find adhesion only when the party seeking to rescind the contract establishes that the other party has used "high pressure tactics" or "deceptive language" or that the contract was the product of a gross inequality of bargaining power. *Morris v. Snappy Car Rental, Inc.*, 84 N.Y.2d 21, 30, 614 N.Y.S.2d 362, 365, 637 N.E.2d 253, 256 (1994). Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change any of the contract's terms. *Dalton v. Educational Testing Serv.*, 155 Misc.2d 214, 588 N.Y.S.2d 741, 746 (Sup.Ct. Queens County 1992), *aff'd* 206 A.D.2d 402, 614 N.Y.S.2d 742 (2d Dep't 1994), *aff'd,* 1995 WL 717083 (1995).

■ To be considered an unenforceable contract of adhesion, the contract also must inflict substantive unfairness on the weaker party, because its terms are not within the reasonable expectations of that party, or because its terms are unduly oppressive, unconscionable, or contrary to public policy. *Ilan v. Shearson/American Express, Inc.*, 632 F.Supp. 886, 890–91 (S.D.N.Y.1985); *Finkle & Ross v. A.G. Becker Paribas, Inc.*, 622 F.Supp. 1505, 1511–12 (S.D.N.Y.1985); Restatement (Second) of Contracts § 208, cmt. d; § 211, cmt. c (1981). A court may refuse to enforce an agreement only if the contract is the product of procedural unfairness *and* suffers from one of the enumerated substantive defects. If either feature is absent, the court will enforce the contract, and even if both features are present the court's only

remedy is non-enforcement, not reformation. *Morris,* 84 N.Y.2d at 30, 614 N.Y.S.2d at 365.

█ This case does not fit neatly into either a contract-of-adhesion or an arms-length-transaction paradigm. Aviall does not contend that Ryder used high-pressure tactics or deceptive language to overpower it in the negotiating process. Rather, Aviall argues that Ryder dictated the terms of the agreement, and that there was no negotiation at all. Specifically, Aviall complains that Ryder did not provide it with independent counsel, that Ryder's counsel drafted the entire Agreement and that a Ryder officer signed the Agreement on Aviall's behalf. (Compl. ¶ 7)

It is true that at the time of the spin-off Aviall's interests were represented by Ryder management, some of whom still work for Ryder, others of whom now work for Aviall. It is also true that Ryder's counsel, the law firm Wachtell, Lipton, Rosen & Katz, drafted the agreement, and that Ryder's current Chief Financial Officer, Edwin Huston, signed the agreement on behalf of Aviall. At that time, however, Huston also was a Vice-President of and member of the Board of Directors of Aviall, and signed the Agreement only after Aviall's Board unanimously consented to the deal. (Huston Dep. pp. 78–79)

█ The spin-off procedure that Aviall decries as oppressive, however, is entirely consistent with traditional principles of corporate governance. When one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders. *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del.1988) (dismissing subsidiary's claim against parent corporation and three former directors of the subsidiary for breach of fiduciary duty by modifying contracts between subsidiary and parent); *Resolution Trust Corp. v. Bonner,* No. 92 Civ. 430, 1993 WL 414679, * 3 (S.D.Tex. June 3, 1993) (dismissing derivative suit against corporation because "a parent corporation owes no duties to its wholly-owned subsidiary"); Dennis J. Block, Nancy E. Barton & Stephen A. Radin,

The Business Judgment Rule: Fiduciary Duties of Corporate Directors 185 (4th ed. 1993). In other words, those who operate the parent company owe no fiduciary duties to the wholly owned subsidiary, and even when the parent company announces a proposed spin-off of the subsidiary, the directors of the parent and the directors of the subsidiary owe no fiduciary duties to the soon-to-be-independent subsidiary's prospective stockholders. *Anadarko,* 545 A.2d at 1174.

Because the officers and directors of a parent company owe allegiance only to that company and not to a wholly owned subsidiary, it is reasonable to conclude that a parent corporation itself is under no obligation to provide the subsidiary with independent representation during the spin-off process. It would be anomalous to impose a duty upon the corporation, an artificial person, when all the natural persons who are its officers and directors have no such duty, and there is no natural person to take up the duty. Aviall has not cited, and I have not found any case imposing more exacting duties on a parent, or holding that the form or content of a particular spin-off agreement constitutes a breach of the fiduciary duties owed to the shareholders of either the parent or the subsidiary.

Just before the spin-off and at the moment it occurs, shareholder ownership of the subsidiary is identical to that of the parent. Consequently, the only people who could have represented Aviall were necessarily people affiliated with Ryder as well, because those affiliations were one and the same. The Agreement is less like a contract between two different parties in which one party may have the opportunity and ability to overwhelm the other, and more like a charter document that creates the subsidiary as an independent entity, somewhat similar to the way in which Congress creates federal agencies by enacting their organic statutes. Just as Congress is responsible to the electorate and not to the agency, so the parent corporation is accountable to its shareholders rather than to the subsidiary company. This accountability to the electorate and the shareholders is the mechanism by which Congress and the parent company

are prevented, albeit indirectly, from trampling on the interests of the entities they create. In essence, the shareholders of Ryder authorized that company's officers and directors to effect the spin-off of Aviall in the manner they thought fit, just as the electorate authorizes its representatives to govern. The result Aviall seeks in this case would establish a principle that would render every clause of every spin-off agreement potentially voidable.

Even if the Agreement, and consequently the agreement to arbitrate, were the product of procedural unfairness, it would not be unenforceable because it is not unduly oppressive, unconscionable, contrary to public policy, or outside the realm of Aviall's reasonable expectations. Aviall states boldly that "[a]s the case law ... demonstrates, the [arbitration clause] offends public policy and is indeed oppressive." (Pl.Mem. in Opp'n to Mot. to Dismiss pp. 16–17) Yet Aviall cites no cases for that proposition, and offers no reasons to support its conclusion. Aviall does not say what public policy is offended by the selection of an arbitrator who is an expert in the relevant field, is familiar with the highly technical facts of the case, and has a prior affiliation with both parties to the dispute. In fact, arbitrators with those very qualifications are frequently selected by contracting parties, to be either sole arbitrators or members of an arbitration panel, and courts routinely uphold those selections. *See, e.g., Westinghouse Elec. Corp. v. New York City Transit Auth.*, 82 N.Y.2d 47, 54–55, 603 N.Y.S.2d 404, 407–08, 623 N.E.2d 531, 534–35 (1993); *Astoria Med. Group v. Health Ins. Plan of Greater New York*, 11 N.Y.2d 128, 136, 227 N.Y.S.2d 401, 403, 182 N.E.2d 85, 87 (1962).

■■■■ If an agreement is not a contract of adhesion, a court may reform it only when it is the product of: (1) "mutual mistake," or (2) unilateral mistake coupled with fraudulent concealment by the knowing party. *Chimart*, 66 N.Y.2d at 573, 498 N.Y.S.2d at 346–47, 489 N.E.2d at 233–34. Reformation will not be granted "for the purpose of alleviating a hard or oppressive bargain," but only to restore the intent of the parties. *George Backer Management Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 219, 413 N.Y.S.2d 135, 139, 385 N.E.2d 1062, 1066 (1978). Aviall has not alleged in any of its papers that the present case fits within either of the above described categories, and the facts before the court do not show that it does.

## IV.

■■■■ Aviall argues also that federal arbitration law permits a court to remove an arbitrator prior to the arbitration when that arbitrator is biased or evidently partial. But arbitration is a creature of contract, and when parties have validly contracted to have a particular arbitrator resolve their disputes, federal courts are loath to alter that selection, especially before the arbitration. *See, e.g., Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 174 (2d Cir.1984); *Michaels v. Mariforum Shipping*, 624 F.2d 411, 414 n. 4 (2d Cir.1980); *Folse v. Richard Wolf Med. Instruments Corp.*, 56 F.3d 603, 605 (5th Cir. 1995); *Corporate Printing Co. v. New York Typographical Union No. 6*, 601 F.Supp. 323, 328 (S.D.N.Y.1984).

■■■■ The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, gives courts only limited powers to modify the method of dispute resolution chosen by the parties. Section 10 of the FAA empowers federal courts to

> make an order *vacating the award* upon the application of any party to the arbitration—

> (2) Where there *was* evident partiality or corruption in the arbitrators, or either of them.

9 U.S.C. § 10(a) (1994) (emphasis added). By its own terms, § 10 authorizes court action only after the arbitrator has rendered a final decision. It empowers courts to vacate an award, not to disqualify an arbitrator before the arbitration is over. In most cases it is inappropriate and difficult to determine the partiality of an arbitrator absent an award that reflects alleged bias. Moreover, allowing courts to review before the fact the partiality of arbitrators would spawn endless litigation and unnecessarily delay the resolution of disputes. *Marc Rich & Co. v. Transmarine Seaways Corp. of Monrovia*, 443 F.Supp. 386, 387–88 (S.D.N.Y.1978). Al-

though an arbitrator must recuse himself if he believes he is partial, that decision is best left to the discretion and good judgment of the individual arbitrator and not to the court, at least before an award is rendered. *Florasynth,* 750 F.2d at 174.

As Aviall repeatedly and energetically stresses, some federal courts have removed arbitrators prior to arbitration hearings. *See, e.g., Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1067–68 & n. 2 (2d Cir.1972); *Masthead Mac Drilling Corp.,* 549 F.Supp. 854, 856 (S.D.N.Y.1982); *Cristina Blouse Corp. v. International Ladies Garment Workers' Union, Local 162,* 492 F.Supp. 508, 509 (S.D.N.Y.1980); *Metropolitan Property & Casualty Ins. Co. v. J.C. Penney Casualty Ins. Co.,* 780 F.Supp. 885, 893–94 (D.Conn.1991); *Third Nat'l Bank in Nashville v. WEDGE Group Inc.,* 749 F.Supp. 851, 855 (M.D.Tenn.1990). These courts have done so in the exercise of their inherent judicial authority, rather than pursuant to a statutory provision, but their reasons for doing so do not bear on this case.

In two of the cases relied on by plaintiff, the court reformed the contract and replaced the named arbitrator because one party concealed its relationship with that arbitrator. In each of these cases, one party learned for the first time after the execution of the contract of that there was a relationship between the arbitrator and the other party. Had that relationship been known earlier that arbitrator would not have been designated. *Masthead Mac,* 549 F.Supp. at 856 (permitting American Arbitration Association to select a neutral arbitrator when defendants failed to disclose their business relationship with the named arbitrator prior to the designation of that arbitrator, and when the parties agreed to the revised process at oral argument); *Christina Blouse,* 492 F.Supp. at 510–11 (reforming contract to require selection of a neutral arbitrator, because after signing the contract, plaintiff learned that the named individual was a former lawyer for the defendant). As state courts do when they reform contracts because of "unilateral mistake," the federal courts replaced the arbitrators in these cases to remedy the defendants' concealment of their relationship with the arbitrator.

In each of two other cases cited by plaintiff, the court reformed the contract and replaced the arbitrator because an intervening event subverted the parties' selection of a neutral arbitrator. In *Erving v. Virginia Squires Basketball Club,* 349 F.Supp. 716 (E.D.N.Y.1972), *aff'd,* 468 F.2d 1064 (2d Cir. 1972), heavily relied on by plaintiff, basketball star Julius "Dr. J" Erving and the team owner agreed to arbitrate disputes before the "Commissioner of the American Basketball Association." Between the execution of the contract and the development of dispute between the parties, the American Basketball Association appointed a new commissioner, who happened to be a partner of the law firm representing defendant. 349 F.Supp. at 719. Dr. J objected to arbitration before this Commissioner, because he was clearly not neutral and because Dr. J's own agent had been secretly acting on behalf of the defendants during the contract negotiations. *Id.* In these circumstances, which closely resemble "mutual mistake," when the written agreement no longer reflects the intent of the parties, the court agreed to reform the contract and appoint a neutral arbitrator. *See also Morris v. New York Football Giants, Inc.,* 150 Misc.2d 271, 575 N.Y.S.2d 1013, 1016–17 (Sup.Ct.New York County 1993) (disqualifying current Commissioner of the National Football League from arbitrating dispute because he was a named defendant in the dispute).

Finally, Aviall cites *Third Nat'l. Bank in Nashville v. WEDGE Group Inc.,* 749 F.Supp. 851, 855 (M.D.Tenn.1990), in which the court removed the designated arbitrator, Ernst & Young, because it was WEDGE's accountant and therefore owed a fiduciary duty to WEDGE and was likely to be partial. Conceivably one could distinguish that case from this one because there, the party seeking to disqualify the arbitrator was an assignee and had not participated in the selection of Ernst & Young as arbitrator. But an assignee assumes the rights and obligations of the contract with its eyes open, and once a complete assignment is made, the assignee cannot pick and choose which provisions it will honor and which it will not. To the

extent that the facts of *WEDGE* bear on the facts here, I respectfully decline to follow it.

■ The present case materially differs from most of those relied on by Aviall. As discussed above, the Agreement generally, and the arbitration clause specifically, are not contracts of adhesion, contracts to which Aviall's assent was fraudulently induced, or contracts that do not reflect the intention of the contracting parties. At the time of contract formation, Aviall was aware that KPMG was Ryder's accountant. In fact, Aviall knew then that at the time of the spin-off and for some time thereafter KPMG would be its own accountant. Aviall's situation is not comparable to that of one party deceived about the other's relationship with the arbitrator.

Furthermore, no evidence suggests that § 3.03(c) was drafted to reflect the parties' anticipation of, intent to appoint, or desire for a neutral arbitrator. Rather, § 3.03(c) reflects an intent to have the person most familiar with the technical underpinnings of any dispute relating to the Distribution Statement resolve those disputes. The existence of the other dispute resolution provisions—§ 3.11(n) of the Distribution Agreement and § 5.04 of the Tax Sharing Agreement—demonstrates that the parties contemplated different kinds of arbitrators for different kinds of disputes, and that while an arbitrator's unfamiliarity with the underlying facts might be a benefit for some disputes, an arbitrator's familiarity and expertise was necessary for others. Moreover, unlike in *Erving* and in *Morris,* no significant and unanticipated intervening event here has frustrated the intent of the contracting parties.

■ These distinctions between · the cases, though, are not surprising, given the unique nature of the contract "formation" here, when Aviall was spun off by its parent, Ryder. Accordingly, instead of allegations of deception or frustration of intent, Aviall has assembled a congeries of facts, set forth in Part I of this opinion, that allegedly demonstrate the "evident partiality," of both KPMG and Capelli, the standard for a motion to vacate an award. These facts, however, do not reach that standard, even if it did apply

at this stage of the proceedings. To establish "evident partiality" the challenging party must show that "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79, 84 (2d Cir.1984) (vacating award when arbitrator was the father of an officer of the union party to the arbitration).

A brief review of Aviall's evidence demonstrates that this standard has not been met for either KPMG or Andrew Capelli. Aviall argues that KPMG is biased because it advised Ryder on the pension-accounting treatment in its dispute with the PBGC, because Aviall's auditor turned over documents to the Ryder engagement team, because KPMG partners have allegedly "assisted" Ryder in the preparation of its case, and because KPMG is still Ryder's accountant and no longer Aviall's accountant. (Pl.Reply Mem. for Summary Judgment pp. 2–3) That KPMG offered tentative conclusions in another dispute with the PBGC does not make KPMG biased here, and Aviall has presented no evidence to support its contentions that KPMG partners are actively assisting in the preparation of the Ryder defense. Moreover, Aviall seems to forget that at the same time KPMG was advising Ryder, it also served as Aviall's accountant. If anything, KPMG may have biases going both ways in this disagreement. One of the primary advantages of arbitration is that the parties can choose an arbitrator with familiarity and expertise in a highly technical area. Yet "[f]amiliarity with a discipline often comes at the expense of complete impartiality." *Morelite,* 748 F.2d at 83. Here, KPMG's relationship with both parties and with the spin-off itself, makes it in one sense an appropriate arbitrator for the dispute, and in another sense an obvious target of allegations of partiality. But those allegations convey nothing that was not anticipated when KPMG was selected as the arbitrator.

■ With respect to Andrew Capelli, the straws that Aviall grasps are even thinner. Liberally construed, Aviall's allegations are as follows: (1) Capelli was "hand-picked" by

Hamlin, the partner in charge of the Ryder account, (2) Capelli works and meets socially with Deming, a KPMG partner who issued a ROI on the pension-accounting treatment prior to the execution of the Distribution Agreement, and (3) Capelli provided the names of several employee benefits experts to Hamlin, Ryder's accountant. Without more, these facts prove nothing more than the unremarkable proposition that as a member of KPMG Capelli knows and works with the other members of that firm. Contrary to Aviall's protests, they do not prove that Capelli has prejudged the dispute. Capelli has no prior dealings with Ryder, and KPMG has erected a wall to prevent Capelli from learning about the dispute prior to receiving the submissions of the parties. (Hamlin Dep. pp. 77–78, 82) Moroever, Capelli has not concealed any of his activities from the parties. *Compare Metropolitan Property*, 780 F.Supp. at 892 (removal of arbitrator prior to arbitration because arbitrator met with one party to discuss its defenses and concealed this fact from the other party).

■ In sum, when the court concludes that one party has deceived the other, that unforeseen intervening events have frustrated the intent of the parties, or that the unmistakable partiality of the arbitrator will render the arbitration a mere prelude to subsequent litigation, it may be appropriate to disqualify the designated arbitrator. But as explained above, the present case does not resemble any of those scenarios, and does not present an independent reason to skirt the FAA's general rule to defer judicial review of the qualifications of an arbitrator until the completion of the arbitration proceedings.

■ Finally, even if the facts of this case warranted modification of the contract under state contract law, or removal of the arbitrator under the Federal Arbitration Act, recent Second Circuit law makes clear that I am powerless to grant Aviall the remedy it seeks—appointment of a neutral arbitrator. *In re Salomon Inc. Shareholders' Derivative Litig.*, 68 F.3d 554, 558 (2d Cir.1995). A court may not compel parties to arbitrate their dispute before an arbitrator that they have not voluntarily selected, even if the chosen arbitrator is unavailable for whatever reason. *Id.* This rule is based on the same principle that justifies the appointment of a different arbitrator in the cases plaintiff cites—the fundamental contract law principle that a party cannot be required to forgo its right to judicial resolution and to arbitrate its dispute before an arbitrator it has not knowingly and voluntarily chosen.

Both parties knowingly and voluntarily elected to have KPMG arbitrate certain disputes arising under the Distribution Agreement. Plainly, Aviall now also agrees to arbitrate this dispute before a court-appointed arbitrator. But as evidenced by its vigorous opposition, Ryder by no means agrees to that procedure. Thus, even if the agreement to arbitrate were deficient, absent a renegotiated arbitration clause, a courthouse would be the only forum for adjudicating Aviall's complaints. That being said, once the award has been rendered Aviall may challenge it in federal court on the basis of evident partiality, corruption, or any of the other grounds listed in § 10 of the FAA, if the facts justify such a challenge.

## V.

Ryder also argues that Aviall's suit should be dismissed because by initially invoking the arbitration procedures specified in the Agreement, Aviall has waived its right to later object to those procedures. Because Aviall has no right to reform the contract, I need not decide that issue here.

\* \* \*

Accordingly, Aviall's motion for summary judgment is denied and Ryder's motion for summary judgment is granted.

SO ORDERED.