Anton SEMMLER, Rosemarie Lunny, Mario Gaiti, Donna Poole, and Laura Melendez, individually and on behalf of all others similarly situated, Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

No. 94 Civil 5549 (SS).

United States District Court, S.D. New York.

March 21, 1997.

Landy & Seymour, New York City (Whitney North Seymour, Jr., Craig A. Landy, Peter James Clines, Sharron E. Ash, of counsel), for plaintiffs.

Wolin, Fuller, Ridley & Miller, L.L.P., Dallas, TX (Robert J. Fuller, Kristine D. Horn, of counsel), Paul, Hastings, Janofsky & Walker, New York City, for defendant Metropolitan Life Insurance Company.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiffs move to reconsider and vacate the ruling of the Hon. Whitman Knapp granting summary judgment dismissing the claim of plaintiff Laura Melendez (the "Melendez judgment"). Plaintiffs further move for leave to amend the Complaint to add an additional plaintiff, Sharon Rocke, and to certify a class pursuant to Fed.R.Civ.P. 23. For the reasons to be discussed, plaintiffs' motion to reconsider and vacate the Melendez judgment is DENIED; plaintiffs' motion to add plaintiff Sharon Rocke is DENIED, and plaintiffs' motion to certify the class is DENIED.

### BACKGROUND

Plaintiffs are enrollees in various medical benefit plans funded and administered by defendant Metropolitan Life Insurance Company ("Met Life"). They have all undergone one of two forms of post-operative pain management: either patient controlled analgesia ("PCA") or epidural narcotic administration ("ENA"). As explained by plaintiffs:

PCA involves the use of a pump, programmed and monitored under the supervision of anesthesiologists or other trained physicians, which permits a patient to

press a button to obtain pain medication intravenously as needed, within the limits set by the physician. [ENA] involves the insertion of a catheter into the epidural space near the spine through which pain medication can be infused continuously and/or intermittently.

(Pl. Class Cert. Mem. at 3). In this action, plaintiffs contest the decision made by defendant's Claims Issues Committee (the "Committee") to deny reimbursement for the expenses incurred in receiving these methods of post-operative pain management. Bringing causes of action based alternatively in the contract language of the plans or under ERISA, plaintiffs insist that they are entitled to reimbursement for these "medically necessary" procedures performed by physicians and/or anesthesiologists.

Defendant contends that PCA and ENA are not separately reimbursable services. It maintains that post-operative pain management in the form of PCA and ENA is covered by the package surgical fee paid to the physician performing the surgery and to the surgical anesthesiologist. Reimbursing plaintiffs separately for their PCA and ENA treatments would amount to double-billing, in defendant's view, because the physician's package fee covers this treatment and because the physician historically has been responsible for ensuring post-operative pain treatment. Furthermore, defendant claims that PCA is not properly considered a service rendered by a "physician" because it is the patient him or herself who actually administers the pain killers—perhaps with the assistance of the nurses on duty.

With respect to plaintiff's motion to reconsider and vacate the judgment of the Hon. Whitman Knapp dismissing all claims of plaintiff Laura Melendez, defendant argues that the decision of the Committee to deny reimbursement for PCA was not arbitrary and capricious, but rather was based on substantial evidence after considering the relevant factors. The end product of the Committee's decision was reasonable, defendant urges. Further, defendant claims that "[t]he evidence is clear and uncontradicted that the Committee's decision was *not* influenced by any alleged conflict or financial interest" that would entitle plaintiff Melendez to de novo review of the Committee's decision. (Def. Vacate Mem. at 21). For these reasons, and because plaintiff Melendez failed to exhaust her administrative remedies as required by the plan and by ERISA, defendant contends that Judge Knapp's decision dismissing Ms. Melendez's claim should be upheld.

In their motion to amend the complaint to add Sharon Rocke as an additional plaintiff and in their motion for class certification, plaintiffs maintain that all of the requirements for class certification have been met. They contend that the interests of justice will be served by the addition of Rocke as another ERISA plaintiff and that such addition "cannot conceivably prejudice defendant." (Pl. Class Cert. Mem. at 2). Defendant, however, counters that class certification should be denied because: (1) individual issues of law and fact predominate over common issues; (2) the claims of the named plaintiffs are not typical of the claims of the class; (3) the representative parties will not fairly and adequately represent the class; (4) plaintiff's motion for class certification is untimely; (5) class action is not a superior method of resolving plaintiffs' claims. Specifically with respect to the motion to amend the complaint to add plaintiff Rocke, defendant argues that this request should be denied "as untimely and prejudicial, and because Rocke's claim is barred for failure to exhaust administrative remedies." (Def. Class Cert. Mem. at 22).

## DISCUSSION

### I. Motion to Reconsider and Vacate the Dismissal of Melendez's Claim

#### A. *Procedural History*

In his September, 1995 opinion, Judge Knapp granted defendant's motion for summary judgment against plaintiff Melendez, writing:

Defendant has provided us with ample evidence of its own historical practice of paying for post-operative pain treatment through its surgical package and that such practice is not uncommon in the medical field. As well, defendant has a made a strong showing that surgeons are usually

qualified to perform all services related to PCA, the type of pain treatment which Melendez received. Thus we are unable to conclude that its decision to reject Melendez' outstanding anesthesiologist's bills was arbitrary and capricious, and we accordingly grant defendant summary judgment against Melendez.

*Semmler v. Metropolitan Life Insurance,* 1995 WL 559390, *11 (S.D.N.Y.1995). Because, *inter alia,* Judge Knapp did not consider the potential conflict of interest under which Metropolitan Life operated as a self-funded plan, and because of the Second Circuit's intervening ruling in *Sullivan v. LTV Aerospace & Defense Co.,* 82 F.3d 1251 (2d Cir.1996) which impacts that analysis, this Court permitted a reconsideration of Judge Knapp's ruling.

### B. Summary Judgment Standard

The standards for evaluating summary judgment motions are well established. Rule 56(c) provides that summary judgment is appropriate when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

The burden is on the moving party to show that no genuine issue of material fact exists. *See Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994) (citation omitted). "A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable jury could return a verdict for the nonmoving party.'" *Iacobelli Constr., Inc. v. County of Monroe,* 32 F.3d 19, 23 (2d Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Once the movant satisfied its initial burden, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995) (citations omitted). "On cross motions for summary judgment, the standard is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other." *Aviall, Inc. v. Ryder System, Inc.,* 913 F.Supp. 826, 828 (S.D.N.Y.1996) (citing *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)). "Simply because the parties have cross-moved and therefore have implicitly agreed that no material issues of fact exist, does not mean that the court must join in that agreement and grant judgment as a matter of law for one side or the other. The court may conclude that material issues of fact do exist and deny both motions." *Id.*

### C. Deferential Review of Committee Decision: Arbitrary or Capricious Standard

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that a denial of benefits challenged under ERISA "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956–57. If the plan vests discretion with a plan administrator or fiduciary, then that fiduciary or administrator's decision is entitled to be upheld unless it is found to be arbitrary and capricious. This is true "regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest." *Id.* The Supreme Court added, however, that "[o]f course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Id.* (citing Restatement (Second) of Trusts § 187, Comment d (1959)) (internal quotation marks omitted).

Last year, the Second Circuit clarified the analysis to be employed in determining under *Firestone* whether a conflict of interest renders an administrator or fiduciary's decision subject to de novo, rather than deferential review. The Court held in *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1255 (2d Cir.1996) that:

in cases where the plan administrator is shown to have a conflict of interest, the test for determining whether the administrator's interpretation of the plan is arbitrary and capricious is as follows: Two inquiries are pertinent. First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; second, whether the evidence shows that the administrator was in fact influenced by such conflict.

*Id.* If plaintiff succeeds in demonstrating that the plan administrator was "in fact influenced by the conflict of interest," the Second Circuit held, "the deference otherwise accorded the administrator's decision drops away and the court interprets the plan de novo." *Id.* at 1256.

In the instant case, the plan under review unquestionably granted to defendant discretion to interpret the plan. *See Semmler v. Metropolitan Life Insurance*, 1995 WL 559390, *11 (S.D.N.Y.1995) (quoting Melendez' plan as providing: "In carrying out their respective responsibilities under the plan, the plan administrator and other plan fiduciaries shall have discretionary authority to interpret the terms of the plan and to determine eligibility for and entitlement to plan benefits in accordance with the terms of the plan."). (*See also* Def.'s Vacate Mem. at 11 n. 5 (quoting plan); Pl.'s Vacate Mem. at 5 ("Plaintiffs do not dispute that the plan covering plaintiff Melendez . . . vests defendant

with such discretion.")). The first question, then, under *Sullivan* is "whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan." *Id.* at 1255. I find that it was.

## 1. *The Committee's Rationale*

■ The Committee's primary [1] reason for its denial of reimbursement for post operative pain management services is set forth in the defendant's Claims Release:

When processing [PCA and ENA] claims the hospital charges for supplies and medication are to be accepted as covered medical expenses and benefits allowed for these items. However, physicians' fees for pain/narcotic management during the immediate post-operative period should be denied because a benefit allowance for pain control is included in our surgical payment to the operating surgeon. The surgeon's fee has historically included pre and post-operative care and pain control is a necessary part of post-operative care.

(Clines Dec. Ex. 3).[2] As further described by Committee member Kelly, the reason for the Committee's decision to deny reimbursement was that the Committee believed "that patient-controlled anesthesia was monitored by the hospital staff and by the surgeon during the surgeon's visits, [that] the surgeon was responsible for the overall care of the patient, and that additional visits by an anesthesiologist were not medically necessary." (Kelly Dep. at 18). To this end, Dr. Katz personally believed that "post-operative analgesia is part of the global fee that the surgeon accepts, and that post-operative pain control is his obligation," (Katz. Dep. at 44), and therefore should not be reimbursed separately to anesthesiologists. I find these conclusions to be rational and amply sup-

---

1. According to the deposition testimony of Dr. Katz, the Committee was also troubled by the fact that because the PCA pump was largely controlled by the patient him or herself, the device could not be deemed one administered by a physician, as that concept was understood under the health care plan. To the extent this rationale is not expressed in defendant's Claims Release and the defendant's stated rationale in the Release is sufficient to justify its decision, I

do not address the Committee's argument on this point.

2. In their Motion for Class Certification, plaintiffs concede that the central issue in this litigation is "whether PCA and epidural narcotic administration are in fact *separate* doctor's services which confer a medical benefit on patients and merit separate compensation." (Pl. Class Cert Mem. at 4) (emphasis in original).

ported by the record. I concur with Judge Knapp's findings on this point:

> Defendant has provided us with ample evidence of its own historical practice of paying for post-operative pain treatment through its surgical package and that such practice is not uncommon in the medical field. As well, defendant has made a strong showing that surgeons are usually qualified to perform all services related to PCA. . . .

*Semmler*, 1995 WL 559390, at \*11.

Therefore, because the conclusion of the Committee is rational and supported by the record, under a deferential review, the Committee's conclusion must be upheld. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995) ("Under the arbitrary and capricious standard of review, we may overturn a decision to deny benefits only if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'") (citing cases); *id.* at 443 ("Where it is necessary for a reviewing court to chose between two competing yet reasonable interpretations of a pension plan, this Court must accept that offered by the administrators.") (citations omitted).

### 2. *Outside Consultants*

■ Plaintiff insists that regardless of the result, the process of the Committee's decisionmaking was arbitrary and capricious in that the Committee's purported deference to the conclusion of outside consultants amounted to a dereliction of its ERISA fiduciary duty to make an independent judgment regarding the insurability · of post operative pain management services. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir.1995) (finding that denial of claim was not supported by substantial evidence and was therefore arbitrary and capricious where Trustees presumably relied solely upon three-sentence report from subcommittee); *Mirto v. Amalgamated Retail Insurance*, 882 F.Supp. 1386, 1390 (S.D.N.Y.1995) (holding that Committee's decision was arbitrary and capricious where "[d]espite plaintiff's detailed objections to the findings of the reviewers, the specific reason stated by the Appeals Committee consist[ed] merely of [the statement that] '[t]he Trustees determined that two independent medical authorities had reviewed the records and concluded that the tests and chiropractic services rendered should not be paid since they were not medically necessary'"); *id.* (providing that "[t]he burden on the Committee is to examine the record ... and, based on that examination, provide its own conclusion and supporting rationale, that is, specific reasons in support of its conclusion.... That burden is not fulfilled by the mere determination that the records had been previously reviewed by medical authorities.").

Plaintiff challenges the Committee's reliance on the advice of outside anesthesiologists—whose identity was not disclosed to the Committee—regarding the insurability of PCA and ENA. Plaintiff contends that because the Committee effectively adopted the conclusion of the unidentified outside consultants without scrutinizing their reasoning and qualifications, the Committee failed to exercise the independent judgment required by ERISA. I do not find the plaintiff's assertions supported by the record.

The evidence clearly and indisputably shows that the Committee spent at least forty minutes discussing the issue of reimbursement for post operative pain management techniques. (Katz Dep. at 42). Such an extended discussion is simply not consistent with the blind acceptance of outside consultants' recommendation. It is also inconsistent with the testimony of Ms. Kelly that the "doctors" discussed various aspects of reimbursement for PCA. (Kelly Dep. at 17–18). Furthermore, while plaintiff tries to depict the Committee's approach as totally close-minded, the Committee's very effort to seek the advice of outside consultants who were experts in the field only leads to the reasonable inference that the Committee took the matter very seriously and fulfilled their obligation under *Bierwirth* to seek outside expert advice where necessary. *See Donovan v. Bierwirth*, 680 F.2d 263, 272–73 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *Miller v.*

**92**

*United Welfare Fund,* 72 F.3d 1066, 1073 (2d Cir.1995). For these reasons, plaintiff's unsubstantiated argument on this point does not create a material issue in dispute regarding the Committee's alleged arbitrary and capricious decisionmaking.

Plaintiff's best evidence regarding the Committee's purported dereliction of its duty to make an independent judgment comes from the following exchange in Dr. Katz' deposition:

A. At the next meeting, the report [from Dr. Klipstein regarding the outside consultants' recommendation] was oral and to the fact that this is not an insurable procedure.

Q. Is that all that the report consisted of, or was there further detail?

A. There was not much detail at the time, and the recommendation was to advise Claims in a claims release not to cover patient-administered analgesia[.]

Q. Who was it that made that report to the committee at the subsequent meeting?

A. Dr. Clipstein. [sic]

Q. Did she state any reason for her recommendation?

A. Well, she indicated she had consulted with outside · anesthesiologists and they did not feel this was a medical service covered under insurance policies.

Q. Did you ask her which outside anesthesiologists she consulted with?

A. No, I didn't.

    *   *   *   *   *   *

Q. Did you ask any questions about the reasons that were given to her for why it was not an insurable procedure?

A. No, I didn't.

Q. Did anybody?

A. I don't think anybody challenged Dr. Clipstein's [sic] suggestions.

Q. Were you satisfied yourself that her recommendation was a proper basis for the Claims Issue Committee to make its own recommendation?

A. Yes, I was satisfied with her report.

    *   *   *   *   *   *

Q. Would you tell us, please, as best you can recall, exactly what Dr. Clipstein [sic] said?

A. To the best of my recollection, she said the person or persons which she consulted did not recommend additional payments for patient-controlled analgesia.

Q. And did she indicate in any way that the person or persons she had consulted were anesthesiologists?

A. Yes, she did.

    *   *   *   *   *   *

Q. And did she say anything else?

A. Not that I can remember.

Q. Did she give any reasoning for the conclusion?

A. No, she gave us no reason.

Q. And was there any discussion by anybody else at that meeting on this question?

A. No, there wasn't.

Q. And was a vote taken?

A. Yes. It was unanimous.

Q. Do you recall how much time was spent on that particular issue?

    *   *   *   *   *   *

A. At that meeting? We must have spent anywhere from forty to fifty minutes on this issue.

Q. Sitting there in silence?

A. No, no, there was discussion, and there was some questions, and the answers were somewhat curt and short, but it did not just slide by, you know.

    *   *   *   *   *   *

Q. And as those questions were being raised during this forty-minute discussion, what response did Dr. Clipstein [sic] give to them?

A. What it came down to is this; if it's controlled by the patient, it is obviously not a medical service, and if it is not

a medical service, then we shouldn't cover it.

Q. Who said that?

A. Dr. Clipstein [sic].

Q. And did she given any other explanation?

A. No.

(Katz Dep. at 39–42, 44). This passage is troubling to the extent that, in places, it suggests that the Committee's consideration of the outside consultants' report was at best curt and superficial. However, it is difficult to discern to what extent this characterization of the Committee's decisionmaking is a result of Dr. Katz's attempt in his deposition to recall the minute details of a conversation which took place over six years before. Internally inconsistent at points, the deposition testimony at worst reveals that Dr. Katz' memory is hazy on the precise contours of the conversation but is clear on the most important issues—that the Committee considered at length the relevant issues and made a decision after independent deliberation. In light of this fact and given Ms. Kelly's testimony regarding the Committee's decisionmaking (Kelly Dep. at 17–18), I find that plaintiff has not raised a sufficient issue of material fact in dispute upon which to proceed to trial.

As a matter of law, I find that even if Dr. Katz' testimony were taken at its worst, the record is still clear that the outside consultants' recommendation was but one factor the Committee considered in arriving at its own conclusion regarding the reimbursement for post operative pain management services. Even as Dr. Katz characterizes the Committee's decision, I find that such a process does not rise to the level of dereliction of duty that has been found to violate ERISA. *Cf. Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir.1995) (holding that Trustees' denial of reimbursement was not supported by substantial evidence where Committee appeared to rely solely on fund administrator's three sentence report that merely listed the amount in controversy, the names of the documents submitted by plaintiff and the service for which plaintiff was presenting a claim; "[r]eliance on such limited information to deny the claim was arbitrary and capri-

cious," especially where fund administrator failed to include or explain all of the items in the administrative record, each of which "either buttressed [plaintiff's] position or was neutral."); *Mirto v. Amalgamated Retail Insurance*, 882 F.Supp. 1386, 1390–91 (S.D.N.Y.1995) (providing that claim administrator's burden to arrive at independent judgment regarding claim "is not fulfilled by the mere determination that the records had been previously reviewed [and claim recommended denied] by medical authorities.").

### 3. *Extra Contractual Condition*

■ In her final argument, plaintiff contends that defendant, in contravention of clear ERISA case law, *see, e.g. Shelden v. Barre Belt Granite Employer Union Pension Fund*, 25 F.3d 74, 80 (2d Cir.1994); *Crean v. New York City District Council of Carpenters Pension Fund*, 1996 WL 389248, *5 (S.D.N.Y.1996), imposed an extra contractual condition on its decision to grant or deny reimbursement for PCA. Plaintiff argues that Dr. Katz' answer to the following questions from plaintiff's counsel reveals that such an extra contractual condition was imposed:

Q. And with respect to the policy that was adopted at Met Life, do you recall whether separate compensation to an anesthesiologist is something that could be considered if there were complications in the medical sense with respect to the condition of the patient?

A. Yes.

Q. You do recall that, and that was something that could be considered under Met Life's policy, right?

A. Right.

(Katz Dep. at 88; quoted at Pl. Vacate Mem. at 13). I disagree.

The above exchange, rather than demonstrating that Met Life imposed extra contractual conditions in its decisionmaking regarding customary PCA, shows that Met Life made a practice of considering extenuating circumstances that might merit a departure from their normal practice of denying reimbursement for such services. Rather than supporting plaintiff's contention, this passage

instead affirms defendant's argument that such a practice is common and is "in accordance with the generally accepted practice that treatment of complications resulting from a compensated procedure is a separate incident meriting consideration for separate payment." (Def. Vacate Mem. at 20). Because plaintiff has not shown that "there were complications in the medical sense with respect to [her] condition," I cannot see how the Committee's purported practice of making exceptions in exceptional cases bears any relevance to this discussion. Hence, I cannot find that any extra contractual condition was imposed in the instant case.

In sum, and for all the reasons indicated, I find that the Committee's decision to deny separate reimbursement for PCA was rational and should be upheld under the highly deferential review standard articulated in *Firestone.* The facts themselves are not in dispute; the only question is what judgment to take from them. I cannot conclude that plaintiff "raise[d] any factual issue sufficient to challenge the reasonableness of the decision." *Mirto,* 882 F.Supp. at 1389. As a matter of law, I conclude that the decision of the Committee was rational. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

### D. *De Novo Review of Committee Decision: Conflict of Interest in Fact*

■ Under *Sullivan,* the second level of inquiry for the Court to undertake is whether the plan administrator was in fact influenced by a conflict of interest in his or her decision to deny benefits. *See Sullivan,* 82 F.3d at 1256. Here, plaintiff has failed to demonstrate that any such conflict of interest in fact influenced the Committee's conclusions. Plaintiff alleges that because there is no "reasonable" explanation for the Committee's decision, it must have been the result of a financial conflict of interest. (*See* Pl. Vacate Mem. at 6 ("[T]he only explanation for the otherwise inexplicable claims policy arrived at by plaintiffs is Metropolitan Life's underlying financial interest in denying reimbursement.")). The Court does not find such an inference reasonable.

First, and perhaps most importantly, because I have previously found that the decision of the Committee was reasonable, I do not credit plaintiff's argument that the only rational explanation for the decision of the Committee was that the Committee was influenced by a financial conflict of interest.

Second, plaintiff points to no evidence that would indicate that the Committee's decision was based on financial motivations. Rather, in at least one instance it appears that the Committee's decision to deny reimbursement was made despite the potential for *negative* financial consequences. *See* Katz Dep. at 45, 49–50 (discussing "concern[ ]" of some members of the Committee that the decision to deny reimbursement would dissatisfy policyholders).

Moreover, there is direct evidence in the testimony of both Committee members that cost played no role in the Committee's consideration. In his deposition, Dr. Katz testified as follows:

Q.  And did it ever come to your attention during the course of the meeting what the cost of PCA claims was to the company?

A.  No, cost was not a consideration.

(Katz Dep. at 45–46). In addition, Dr. Katz testified that he had no idea what the cost of the services at issue were. (Katz Dep. at 46–48). When asked a similar question in her deposition, Ms. Kelly testified:

Q.  Would the financial impact on Met Life with respect to policies where MetLife acted as the insurer ever be discussed by the [Committee]?

A.  That was not a concern of the [Committee]. Obviously, you know, if we work for Met Life we are concerned about Met Life and Met Life being a successful company, but the mission of this committee was to make decisions based on appropriate reimbursement for the contracts that we had in place, and we made every attempt to be as fair as possible under the terms of the

contracts. The decisions were not driven by what the impact would be to Met Life.

(Kelly Dep. at 147; *see also id.* at 149 ("Q. Was there any discussion by anyone at the [Committee] meetings of the financial impact of whether to pay a separate reimbursement for PCA on MetLife? A. Not that I remember.")). Ms. Kelly also testified that the Committee never "receive[d] information as to the potential financial impact on Met Life of a claims policy decision[.]" (*Id.*). In fact, she said that in order to understand the financial impact on MetLife of the decisions made by the Committee, one would have to have the skills of an actuary, and no such actuary was typically in attendance at Committee meetings. (*Id.* at 148). This testimony amply supports the defendant's contention that no conflict of interest in fact influenced the Committee's decision to deny reimbursement for PCA.[3] And, in light of the fact that plaintiff has produced no evidence to the contrary, summary judgment in favor of the defendant is appropriate.

In sum, I conclude that plaintiff has not demonstrated the influence in fact of a financial conflict of interest, as required by *Sullivan.* De novo review of the Committee's decision is therefore inappropriate. Plaintiff has not put forward a genuine issue of material fact upon which to proceed to trial. For this reason, defendant's summary judgment motion with respect to plaintiff Melendez is granted.[4] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

3. In addition, defendants note that the Committee's decision was applicable "not just to ERISA plans where MetLife was the insurer, but also to ERISA plans for which MetLife did not insure but merely administered claims." (Def's Vacate Mem. at 10–11).

4. Because the Court has granted the defendant's summary judgment motion on the merits, there is no need for the Court to address the question whether plaintiff Melendez appropriately ex-

## II. Motion to Amend Complaint to Add ERISA Plaintiff Sharon Rocke

Plaintiffs seek to amend the complaint to add an additional ERISA plaintiff, Sharon Rocke. Upon the Court's request, both plaintiffs' and defendant's counsel submitted evidence that the plan fiduciary under Rocke's health care plan was afforded "full power and discretion to resolve all issues concerning eligibility, status, entitlement to benefits, and any other interpretations under each of the benefit plans described in this book." (MetLife Policy, Attachment to Clines Letter to Court, 3/19/97). In light of my above finding that the Committee's decision to deny reimbursement for post operative pain management must be upheld under the arbitrary and capricious standard of review afforded plans that grant administrators discretion, I deny plaintiffs' motion to amend the complaint to add a plaintiff against whom I would immediately have to grant summary judgment. As the Second Circuit stated in *Acito v. IMCERA Group, Inc.,* "[a]lthough the decision whether to allow the plaintiffs to amend their complaint is left to the sound discretion of the district court, there must be good reason to deny the motion. One good reason to deny leave to amend is when such leave would be futile." 47 F.3d 47, 54 (2d Cir.1995) (citations omitted).

## III. Motion for Class Certification

Given that my above conclusion regarding the Melendez judgment and the motion to amend has left plaintiffs with no remaining representative for the potential class or subclass of ERISA litigants, I must deny plaintiffs' request for class certification because there is a failure of typicality and fair and adequate representation. *See* Fed. R.Civ.P. 23(a). *See also Kenavan v. Empire Blue Cross Blue Shield,* 1996 WL 14446, *4

hausted her administrative remedies, as required under ERISA. *See e.g. Kennedy v. Empire Blue Cross and Blue Shield,* 989 F.2d 588, 594 (2d Cir.1993) ("This Court has recognized 'the firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases.' ") (quoting *Alfarone v. Bernie Wolff Construction,* 788 F.2d 76, 79 (2d Cir.) *cert. denied,* 479 U.S. 915, 107 S.Ct. 316, 93 L.Ed.2d 289 (1986)).

(S.D.N.Y.1996), *aff'd sub nom., Schmookler v. Empire Blue Cross Blue Shield,* 1997 WL 64204 (2d Cir.1997). Therefore, I dismiss the motion for class certification of these litigants without prejudice unless within sixty days of the date of this Opinion and Order an ERISA plaintiff under a plan with no fiduciary discretion is granted leave to intervene. If a representative of this class does intervene, the Court will then have to consider whether the above-described class or subclass of ERISA plaintiffs is sufficiently numerous to satisfy Fed.R.Civ.P. 23(a)(1) and whether the individual question of exhaustion of administrative remedies predominates over the common question of defendant's liability. *See* Fed.R.Civ.P. 23(b)(3); *Kenavan,* 1996 WL 14446 at *4.

· With respect to the named plaintiffs whose plans are not governed by ERISA, I find that if no ERISA representative meeting the above requirements intervenes in this action within sixty days of the date of the Opinion and Order, "all bases for federal jurisdiction will have been eliminated from this case." *Kenavan,* at *5. If there is no such intervention and thereby no remaining basis for federal jurisdiction, I will adopt the reasoning of my colleague, Judge Kimba Wood, in *Kenavan,* and remand the state law claims of the non-ERISA plaintiffs to state court, where they may seek class certification. *See id.* (citing cases); *Gelb v. Board of Elections,* 950 F.Supp. 82, 86–87 (S.D.N.Y.1996) (citing cases providing that where federal bases of jurisdiction are dismissed before trial, recommended practice is to remand remaining state law claims to state court).

### *CONCLUSION*

For the reasons discussed above, plaintiffs' motion to reconsider and vacate the judgment of Judge Whitman Knapp regarding plaintiff Melendez is **DENIED.** Plaintiffs' motion to amend the complaint is likewise **DENIED.** With respect to plaintiffs' motion for class certification, I **DENY** the motion without prejudice, unless within sixty days from the date of this Opinion and Order an ERISA plaintiff whose plan affords the administrator no discretion is granted leave to intervene. If no such intervention is granted, the remaining non-ERISA plaintiffs' claims will be remanded to state court for lack of a remaining basis for federal jurisdiction.

As noted in my memorandum endorsement of October 3, 1996, I am prepared to grant a Rule 54(b) certification of my decision. Counsel should consider whether it would be more prudent, however, to defer the certification until such time as the class certification motion is finally resolved. In any event, counsel for both parties are instructed to appear before the Court for a status conference on *Friday, April 18, 1997 at 3:00 p.m.*

**SO ORDERED.**