William BLACK and Professional
Management, Inc., Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,
Defendant.

No. CIV. A. 99–1649(JR).

United States District Court,
District of Columbia.

Feb. 2, 2000.

Henry Morris, Jr., Jennifer A. Albert, Anne M. Hamilton, Washington, DC, Leonard Mungo, Leonard Mungo & Associates, Detroit, MI, Counsel for Plaintiffs.

Joseph A. Yablonski, Yablonski, Both & Edelman, Washington, DC, Counsel for Defendant.

## MEMORANDUM

ROBERTSON, District Judge.

William Black claims that the National Football League Players Association (NFLPA) unlawfully initiated disciplinary proceedings against him, affecting his livelihood as a player agent. NFLPA moves for summary judgment.[1] Plaintiff opposes that motion and moves for leave to amend. Plaintiff will be permitted to take discovery on his claim of discrimination under 42 U.S.C. § 1981, but defendant is entitled to judgment as a matter of law on the claims of tortious interference and violation of the Federal Arbitration Act. Leave to file new claims of defamation and trade disparage-

ment will de denied. The reasons for those rulings are set forth below.

### Background

The following facts are drawn primarily from the parties' LCvR 7.1(h) statements, but are supplemented as needed by subsequent filings. They are undisputed.

NFLPA is the exclusive collective bargaining representative of NFL players pursuant to Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a). NFLPA nevertheless permits individual agents, or "contract advisors," to represent individual players in negotiations with NFL Clubs. NFLPA "certifies" contract advisors pursuant to a set of regulations. Those regulations set forth a code of conduct for contract advisors, and require that issues regarding the activities of contract advisors be resolved by arbitration.

Mr. Black was first certified as a NFLPA contract advisor in March 1995. He submitted a sworn application to continue his certification on September 9, 1998. The application contained this statement:

> In submitting this Application, I agree to comply with and be bound by these Regulations ... I agree that if I am denied certification or if subsequent to obtaining certification it is revoked or suspended pursuant to the Regulations, the exclusive method for challenging any such action is through the arbitration procedure set forth in the Regulations. In consideration for the opportunity to obtain certification and in consideration of NFLPA's time and expense incurred in the processing of this application for such certification, I further agree that this Application and the Certification, if one is issued to me, along with the NFLPA Regulations Governing Contract Advisors shall constitute a contract between NFLPA and myself.

---

1. Because matters outside the pleadings have been considered, the case has been decided

under the rubric of Fed.R.Civ.P. 56.

In May 1999, Mr. Black received a disciplinary complaint from NFLPA's Disciplinary Committee.[2] He commenced this action a month later, asserting that the disciplinary complaint was the product of an antitrust conspiracy and a secondary boycott, in violation of the Sherman Antitrust Act and the National Labor Relations Act, and that the arbitration system established by the regulations violates the Federal Arbitration Act. Mr. Black's motion for a temporary restraining order was denied on June 22, 1999 by Judge Hogan, and Mr. Black filed an answer to the disciplinary complaint on July 6, 1999.

On July 27, 1999, the Disciplinary Committee issued a proposed ruling revoking Mr. Black's contract advisor certification for a minimum of three years. The regulations provide that Mr. Black may challenge the proposed ruling only by taking the matter to arbitration before an arbitrator selected by NFLPA—in this case, Roger P. Kaplan, Esq.

On July 29, 1999, Mr. Black filed an amended complaint. This first amended complaint jettisons the antitrust and secondary boycott claims and adds two new claims: that NFLPA's initiation of the disciplinary proceedings was based on race discrimination in violation of Section 1981; and that NFLPA tortiously interfered with Mr. Black's business relations (and those of his corporate entity Professional Management, Inc.) by invoking disciplinary action. Mr. Black continues to claim that

the arbitration process established by the regulations is illegal under the FAA.

Now before the Court are NFLPA's motion to dismiss or, in the alternative, for summary judgment on all three counts in plaintiffs' first amended complaint, and plaintiffs' motion for leave to file a second amended complaint that would add claims of defamation and trade disparagement.

*Analysis*

A. *Section 1981 Claim*

Mr. Black asserts that NFLPA deprived him and his company of full enjoyment of their contractual relationship with NFLPA in violation of 42 U.S.C. § 1981. He asserts that three white agents subjected to disciplinary action by the NFLPA—Joel Segal, Jeffrey Irwin and James Ferraro—were treated more favorably than he.

To establish a prima facie case of discrimination under Section 1981, Mr. Black must demonstrate that his non African-American comparators were similarly situated to him in all material respects. *See Coward v. ADT Security Systems*, 140 F.3d 271, 274 (D.C.Cir.1998). This standard makes it questionable whether Mr. Black's claim can succeed. The timing and gravity of the charges against Mr. Segal appear to be quite different from those against Mr. Black. Mr. Black has not yet had an opportunity for discovery, however, and he has asked in his LCvR 7.1(h) statement for "a chance to obtain affidavits and take depositions and other discovery" pur-

---

**2.** The disciplinary complaint alleged, *inter alia*, that, in violation of the regulations: (1) at various times in 1997 and 1998 Mr. Black provided cash payments to several college players before their eligibility had expired; (2) in late December 1998 Mr. Black arranged the purchase of a Mercedes–Benz automobile for a University of Florida player who was still competing at the college level; (3) in December 1998 Mr. Black met with an assistant coach at Louisiana State University and admitted to purchasing the Mercedes–Benz for the University of Florida football player; (4) in December 1998 an agent identifying himself as Mr. Black's representative offered a bribe to an assistant coach at LSU to en-

courage an LSU player to enlist Mr. Black as his agent; (5) at various times in 1996 Mr. Black sold stock in a publicly-traded company to several players; (6) over the past three years Mr. Black has provided a bill paying service for his clients whereby they deposit funds in accounts which Mr. Black's firm jointly controls; (7) on his application for certification as a contract advisor, Mr. Black untruthfully answered "NO" when asked: "Do you manage, invest, or in any other manner handle funds for NFL players?"; and (8) in May 1997 Mr. Black filed suit in South Carolina state court against Brantley Evans, Jr., in contravention of exclusive arbitration procedures in the regulations.

suant to Fed.R.Civ.P. 56(f). Because Rule 56(f) requests should be "liberally construed," *see* Moore's Federal Practice ¶ 56.10[8][a] (3d ed.1999), Mr. Black will have a "reasonable opportunity" to justify his opposition. *First Chicago Int'l v. United Exchange Co.,* 836 F.2d 1375, 1380 (D.C.Cir.1988). The same ruling will apply with respect to the other alleged comparators, Messrs. Irwin and Ferraro, as to whom the NFLPA has made no factual response to Mr. Black's section 1981 claims.

### B. *Tortious Interference*

■ Mr. Black and PMI allege that NFLPA, by means of its racially discriminatory actions and by making defamatory statements, tortiously interfered with their existing and prospective business and contractual relations. NFLPA's motion argues that these state law based claims are preempted by Section 301 of the Labor Management Relations Act. It is undisputed that NFLPA is a labor union and that the NFLPA contract advisor regulations were formulated in accordance with the collective bargaining agreement.

In *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 213, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the Supreme Court applied the rule that a tort claim "inextricably intertwined with consideration of the terms of the labor contract" is preempted under Section 301. Mr. Black and PMI are not parties to the labor contract, but, as contract advisors, they have agreed to be bound by the regulations promulgated under the collective bargaining agreement. Their license to act as agents for NFL players comes by delegation from the NFLPA, which is a party to the collective bargaining agreement.

3. This claim is not "based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." *Lingle,* 486 U.S. at 411–12, 108 S.Ct. 1877 (citation omitted).

■ State law based claims that depend on construction and application of terms in a collective bargaining agreement are preempted. Those that have a basis wholly independent of the labor contract are not. *Compare United Steelworkers v. Rawson,* 495 U.S. 362, 371, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) (state wrongful death claim based on union's negligent inspection of workplace preempted, because duty to inspect was assumed through collective bargaining agreement) *and International Brotherhood of Electrical Workers v. Hechler,* 481 U.S. 851, 862, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987) (state tort claim alleging employer's failure to train preempted, because not sufficiently independent of collective bargaining agreement) *with Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 411–12, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988) (state retaliatory discharge claim *not* preempted, because based on statutory rights separate from the collective bargaining agreement).

The gravamen of Mr. Black's tortious interference claim is that NFLPA engaged in "discriminatory treatment . . . under the pretext of a disciplinary proceeding" and thereby deliberately interfered with his contractual relationships with NFL players. Pls.' Opp'n at 11. He does not assert a violation of a right to contract "owed to every person in society," *Rawson,* 495 U.S. at 370, 110 S.Ct. 1904 or any other generalized statutory right.[3] Mr. Black's complaint is about the way in which NFLPA has conducted and will conduct his disciplinary proceeding. That complaint turns upon the proper application of the regulations to Mr. Black's alleged illegal activities as a contract advisor. Thus, *Rawson, Hechler* and their progeny, rather than the *Lingle* line of cases, control. Mr. Black's state law claim "cannot be described as independent of the collective-bargaining agreement." *Id.* at 370.[4]

4. The District of Columbia law of tortious interference confirms that Mr. Black's claim is "inextricably intertwined" with the regulations. To make out a prima facie case of tortious interference, a plaintiff must show: (1) "the existence of a valid business relation-

The validity of PMI's contracts with "various football players relating to certain marketing, promotional and public relations services that PMI was to render for players," Pls.' Opp'n at 9, and PMI's expectancy that those contracts would continue in effect are derivative of Mr. Black's position. Thus, even though PMI's tortious interference claim is in some sense further removed from the regulations than Mr. Black's individual claim, its very existence depends upon interpretation and application of the regulations.

## C. *Federal Arbitration Act*

■ Mr. Black attacks NFLPA's arbitration system as inherently biased, asserts that Arbitrator Kaplan, who is scheduled to hear the appeal of his disciplinary complaint, is not "neutral" under the terms of the regulations, and demands that Mr. Kaplan be removed. As authority for his demand, Mr. Black invokes Section 10 of the FAA, which empowers a federal court to vacate an arbitration award in limited and specified circumstances, one of which is evident partiality or corruption of the arbitrator.

Mr. Black consented to be bound by NFLPA's contract advisor regulations and agreed that, if his certification should be "suspended or revoked, the exclusive method for challenging any such action is through the arbitration procedure set forth in the Regulations." Section 5.D of the regulations provides: "NFLPA shall select a skilled and experienced person to serve as the outside impartial Arbitrator for all cases arising hereunder."

A written agreement to arbitrate a dispute is "valid, irrevocable, and enforceable" except on grounds that would exist at law or in equity for the revocation of contract. 9 U.S.C. § 2. The Supreme Court has observed that "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements." *Perry v. Thomas,* 482 U.S. 483, 489, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). Any questions or doubts as to the intentions of the parties "are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

Mr. Black's legal proposition is that a federal court may step in to preempt agreed-upon arbitration methods and appoint a "neutral" arbitrator where "the potential bias of a named arbitrator makes arbitration proceedings a prelude to later judicial proceedings challenging the arbitration award." He relies for that proposition on a single district court decision, *Third National Bank v. WEDGE Group, Inc.,* 749 F.Supp. 851 (M.D.Tenn.1990). That case is factually distinguishable from this one, however, and it has been disavowed by the very court on whose opinions it relied. *See Aviall, Inc. v. Ryder System, Inc.,* 110 F.3d 892, 896 (2d Cir.1997).

The *Aviall* decision is more on point. In that case, the court held that a parent company's outside auditor, KPMG Peat Marwick, could not be removed prior to arbitration with a subsidiary because "Aviall was fully aware of KMPG's relationship with Ryder when the [agreement] was executed." Distinguishing *WEDGE,* the *Ryder* court noted that "the touchstone in [cases where arbitrators have been removed] was that the arbitrator's relationship to one party was undisclosed, or unanticipated and unintended, thereby invalidating the contract." *Id.* at 896; *see also NFLPA v. OPEIU,* No. 97–1517 at 5–7 (D.D.C. March 25, 1999).

ship and expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enterprises, Inc. v. Domi-*

*no's Pizza, Inc.,* 45 F.3d 493, 498 (D.C.Cir. 1995). The NFLPA's regulations in this case establish the parameters of Mr. Black's *expectancy* that his business relationship would continue, in view of his actions.

Mr. Black admits that he was aware of and freely agreed to the arbitration terms contained in the regulations, and he makes no allegation about infirmities in the drafting of the regulations. As *Aviall* makes clear, it is of no moment that Mr. Black did not have a hand in the structuring of the arbitration process. *See Aviall,* 110 F.3d at 896. An NFL-selected arbitrator may have an incentive to appease his or her employer, but "[t]he parties to an arbitration choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen." *Merit Ins. Co. v. Leatherby Insurance Co.,* 714 F.2d 673, 679 (7th Cir.1983). Mr. Black's peremptory challenge to the neutrality of the NFLPA arbitrator must accordingly be rejected. "He remains free to challenge on the ground of evident partiality any [penalty] ultimately" approved through arbitration. *Aviall,* 110 F.3d at 897.

### D. *Second Amended Complaint*

Mr. Black's proposed second amended complaint sets forth new claims of defamation and trade disparagement. It is well settled that "a liberal, pro-amendment ethos dominates the intent and judicial construction of Rule 15(a)." Moore's Federal Practice § 15.14[1]. It is also true, however, that "[a] motion to amend the [c]omplaint should be denied as 'futile' if the complaint as amended could not survive a motion to dismiss." *FDIC v. Bathgate,* 27 F.3d 850, 874–76 (3d Cir.1994); *Graves v. United States,* 961 F.Supp. 314, 317 (D.D.C.1997)(citing 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487 (2d ed.1990)).

█ Defamation claims are subject to a "heightened pleading standard." *See Wiggins v. Philip Morris, Inc.,* 853 F.Supp. 458, 466 (D.D.C.1994). To survive a motion to dismiss, "[a]ll averments of defamation must be plead with particularity." *Id.* at 465. Conclusory statements averring defamation "are insufficient to state a claim," *Hoffman v. Hill and Knowlton, Inc.,* 777 F.Supp. 1003, 1005 (D.D.C.1991), and defamation plaintiffs should therefore plead the time, place, content, speaker and listener of the alleged defamatory matter. *See Wiggins v. Equifax,* 848 F.Supp. 213, 223 (D.D.C.1993).

█ In his second amended complaint, Mr. Black does not set forth his defamation claims with the specificity required to withstand a motion to dismiss. *See Wiggins,* 853 F.Supp. at 465–66 (dismissing plaintiff's defamation claims as too vague and imprecise); *Hoffman,* 777 F.Supp. at 1005 (dismissing plaintiff's defamation claims as "based on inference and conjecture"). Rather, he makes generalized and conclusory allegations about statements made "by NFLPA representatives at [ ] NFLPA Players Representatives meeting[s] . . . to the effect that" Mr. Black was a "bad and corrupt agent" who had engaged in "illegal activities." Second Am. Compl. ¶¶ 27–28. Mr. Black presents no "factual allegations" that defamatory statements were actually made, let alone what they were and who made them. *See id.*

█ Mr. Black's one reference to a specific publication does not withstand even modest scrutiny. The charge is that "the NFLPA," in a February 8–14, 1999, edition of *Street & Smith's Sports Business Journal,* stated that "Black tried to bribe an LSU assistant football coach." In fact, the article states that the "Union President . . . wouldn't comment on the Black investigation." *See* Ex. A to Def.'s Opp'n. No reasonable juror could determine that "no comment" is defamatory. Because none of Mr. Black's defamation claims could survive a motion to dismiss, they are "futile" for the purpose of a second Rule 15(a) amendment.

The trade disparagement claim in plaintiffs' proposed second amended complaint, *see* ¶¶ 63–66, depends for its legal sufficiency on the presence of defamatory

statements, so it, too, is futile.[5]

An appropriate order accompanies this memorandum.

## ORDER

For the reasons set forth in the accompanying memorandum, it is this 1st day of February 2000,

ORDERED that defendant's motion to dismiss or for summary [# 23] is granted in part and denied in part. And it is

FURTHER ORDERED that plaintiffs' motion for leave to file a second amended complaint [# 25] is denied.

---

**5.** Plaintiffs' claim of "trade disparagement" is virtually identical to a claim for "injurious falsehood." *See Art Metal—U.S.A., Inc. v. United States,* 753 F.2d 1151, 1155–56 (D.C.Cir.1985). Defamation and the tort of "injurious falsehood," are "closely related," and "changes in the law of defamation … have further minimized the common law distinctions between the torts." *See id.*